1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISSLAW LLP**
9100 Wilshire Blvd., #725 E.
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile:  310/209-2348

*Attorneys for Plaintiff*

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM B. FEDERMAN LIVING TRUST TRUST NO. 1, <br><br> Plaintiff, <br><br> vs. <br><br> S&P GLOBAL INC., RICHARD E. THORNBURGH, MARCO ALVERA, WILLIAM J. AMELIO, WILLIAM D. GREEN, CHARLES E. HALDEMAN, JR., STEPHANIE C. HILL, REBECCA JACOBY, MONIQUE F. LEROUX, IAN PAUL LIVINGSTON, MARIA R. MORRIS, DOUGLAS L. PETERSON, EDWARD B. RUST, JR., and KURT L. SCHMOKE, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> JURY TRIAL DEMANDED |

Plaintiff William B. Federman Living Trust Trust No. 1 ("Plaintiff"), on behalf of itself and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through its counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for its Complaint:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NATURE OF THE ACTION**

This is an action brought by Plaintiff against S&P Global Inc. ("S&P Global" or the "Company") and the members of S&P Global's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which S&P Global will merge with IHS Markit Ltd. ("IHS Markit") through S&P's wholly owned subsidiary, Sapphire Subsidiary, Ltd. ("Merger Sub") (the "Proposed Transaction").

2.     On November 30, 2020, S&P and IHS Markit issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated November 29, 2020 (as amended January 20, 2021, the "Merger Agreement") to merge S&P with IHS Markit.  Under the terms of the Merger Agreement, each IHS Markit stockholder will receive 0.2838 shares of S&P common stock for each share of IHS Markit common stock they own (the "Merger Consideration").   Upon completion of the merger, IHS Markit stockholders will own approximately 32.25% of the common stock of the combined company and S&P Global stockholders will own approximately 67.75% of the common stock of the combined company.  The Proposed Transaction is valued at approximately $44.5 billion.

3.     On January 22, 2021, S&P filed a Form 424B3 Prospectus (the "424B3") with the SEC.  The 424B3, which recommends that S&P stockholders vote in favor of the issuance of S&P common stock to IHS Markit stockholders in connection with the Proposed Transaction (the "Share Issuance"), omits or misrepresents material information concerning, among other things: (i) IHS Markit's and S&P Global's financial projections and the data and inputs underlying the valuation analyses performed by Goldman, Sachs & Co. LLC ("Goldman"); and (ii) Goldman's potential

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

conflicts of interest.  Defendants authorized the issuance of the false and misleading 424B3 in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      In short, unless remedied, S&P Global's public stockholders will be irreparably harmed because the 424B3's material misrepresentations and omissions prevent them from making a sufficiently informed voting decision on the Share Issuance.  Plaintiff seeks to enjoin the stockholder vote on the Share Issuance unless and until such Exchange Act violations are cured.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

6.      The Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because: (i) the Company maintains and operates executive offices located in this District; (ii) one or more of the defendants either resides in or maintains offices in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of S&P Global.

9.      Defendant S&P is a New York corporation, with its principal executive offices located at 55 Water Street New York, New York 10041.  The Company also has offices located at One

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

California Street, 31st Floor, San Francisco, CA 94111.  The Company provides credit ratings, benchmarks and analytics in the global capital and commodity markets, offering ESG solutions, deep data and insights on critical business factors.  S&P's common stock trades on the New York Stock Exchange under the ticker symbol "SPGI."

10.     Defendant Richard E. Thornburgh ("Thornburgh") has been the Company's Non-Executive Chairman since September 2020 and a director since 2011.

11.     Defendant Marco Alvera ("Alvera") has been a director of the Company since 2017.

12.     Defendant William J. Amelio ("Amelio") has been a director of the Company since 2019.

13.     Defendant William D. Green ("Green") has been a director of the Company since 2011.

14.     Defendant Charles E. Haldeman, Jr. ("Haldeman") has been a director of the Company since September 2012.

15.     Defendant Stephanie C. Hill ("Hill") has been a director of the Company since 2017.

16.     Defendant Rebecca Jacoby ("Jacoby") has been a director of the Company since 2014.

17.     Defendant Monique F. Leroux ("Leroux") has been a director of the Company since 2016.

18.     Defendant Ian Paul Livingston ("Livingston") has been a director of the Company since September 2020.

19.     Defendant Maria R. Morris ("Morris") has been a director of the Company since 2016.

20.     Defendant Douglas L. Peterson ("Peterson") has been President and Chief Executive Officer ("CEO") of the Company since November 2013 and a director since 2013.

21.     Defendant Edward B. Rust, Jr. ("Rust") has been a director of the Company since 2001.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

22.    Defendant Kurt L. Schmoke ("Schmoke") has been a director of the Company since 2003.

23.    Defendants identified in paragraphs 10-22 are referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

24.    IHS Markit is a Bermuda corporation, with its principal executive offices located at Fourth Floor, Ropemaker Place, 25 Ropemaker Street, London England EC2Y 9LY.  IHS Markit is a world leader in critical information, analytics and solutions for major industries and markets worldwide.  It delivers next-generation information, analytics and solutions to customers in business, finance and government, improving their operational efficiency and providing deep insights that lead to well-informed, confident decisions.  IHS Markit has more than 50,000 business and government customers, including 80 percent of the Fortune Global 500 and the world's leading financial institutions.  IHS Markit's common stock trades on the New York Stock Exchange under the ticker symbol "INFO."

25.    Merger Sub is a Bermuda exempted company limited by shares and a wholly owned subsidiary of S&P.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

26.    Incorporated in 1925, S&P Global is a leading provider of transparent and independent ratings, benchmarks, analytics and data to the capital and commodity markets worldwide.  The capital markets include asset managers, investment banks, commercial banks, insurance companies, exchanges, trading firms and issuers; and the commodity markets include producers, traders and intermediaries within energy, metals, petrochemicals and agriculture.  The Company serves its global

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

customers through a broad range of products and services available through both third-party and proprietary distribution channels.

27.     The Company's operations consist of four reportable segments: S&P Global Ratings ("Ratings"), S&P Global Market Intelligence ("Market Intelligence"), S&P Global Platts ("Platts") and S&P Dow Jones Indices ("Indices").  Ratings is an independent provider of credit ratings, research and analytics to investors, issuers and other market participants.  Market Intelligence's portfolio of capabilities are designed to help investment professionals, government agencies, corporations and universities track performance, generate alpha, identify investment ideas, understand competitive and industry dynamics, perform evaluations and assess credit risk.  Platts is the leading independent provider of information and benchmark prices for the commodity and energy markets.  Indices is a global index provider maintaining a wide variety of indices to meet an array of investor needs.

28.     On October 27, 2020, S&P Global announced its third quarter 2020 financial results, including Company revenue of $1.846 billion, an increase of 9% compared to the same period in 2019.  Adjusted net income increased 14% to $689 million and adjusted diluted earnings per share increased 16% to $2.85.  Defendant Peterson commented on the results, stating:

> S&P Global has a collection of strong and resilient businesses that continued to perform well in the current environment.  The demand for our ratings, benchmarks, research, data, and analytics is greater than ever during uncertain and volatile markets.  Two years ago, we established a number of growth initiatives.  It is very encouraging to see so many of these investments result in new products that we have launched this year.  This is particularly true with our ESG investments and the traction that our new ESG products are gaining in the marketplace.

**The Proposed Transaction**

29.     On November 30, 2020, S&P Global and IHS Markit issued a joint press release announcing the Proposed Transaction.  The press release states, in relevant part:

> NEW YORK and LONDON, Nov. 30, 2020 /PRNewswire/ -- S&P Global (NYSE: SPGI) and IHS Markit (NYSE: INFO) today announced they have entered into a

definitive merger agreement to combine in an all-stock transaction which values IHS Markit at an enterprise value of $44 billion, including $4.8 billion of net debt.  The transaction brings together two world-class organizations, a unique portfolio of highly complementary assets in attractive markets and cutting-edge innovation and technology capability to accelerate growth and enhance value creation.

Under the terms of the merger agreement, which has been unanimously approved by the Boards of Directors of both companies, each share of IHS Markit common stock will be exchanged for a fixed ratio of 0.2838 shares of S&P Global common stock.  Upon completion of the transaction, current S&P Global shareholders will own approximately 67.75% of the combined company on a fully diluted basis, while IHS Markit shareholders will own approximately 32.25%.

S&P Global and IHS Markit's unique and highly complementary assets will leverage cutting-edge innovation and technology capability, including Kensho and the IHS Markit Data Lake, to enhance the customer value proposition and provide the intelligence customers need to make decisions with conviction.  Serving a global customer base across financial information and services, ratings, indices, commodities and energy, and transportation and engineering, the pro forma company will provide differentiated solutions important to the workflows of many of the world's leading companies.

The transaction creates a pro forma company with increased scale, world-class products in core markets and strong joint offerings in high-growth adjacencies, including private assets, small and medium enterprises ("SME"), counterparty risk management, supply chain and trade and alternative data.  Combined, the two companies will provide comprehensive solutions across data, platforms, benchmarks and analytics in ESG, climate and energy transition.

Douglas Peterson, President and Chief Executive Officer of S&P Global, will serve as CEO of the combined company.  Lance Uggla, Chairman and Chief Executive Officer of IHS Markit, will stay on as a special advisor to the company for one year following closing.

"Through this exciting combination, we are able to better serve our markets and customers by creating new value and insights," said Mr. Peterson.  "This merger increases scale while rounding out our combined capabilities, and accelerates and amplifies our ability to deliver customers the essential intelligence needed to make decisions with conviction.  We are confident that the strengths of S&P Global and IHS Markit will enable meaningful growth and create attractive value for all stakeholders.  We have been impressed by the IHS Markit team and look forward to welcoming the talented IHS Markit employees to S&P Global."

"This transaction is a win for both IHS Markit and S&P Global as we leverage our respective strengths in information, data science, research and benchmarks," said Mr. Uggla.  "Our highly complementary products will deliver a broader set of offerings across multiple verticals for the benefit of our customers, employees and shareholders.  Our cultures are well aligned, and the combined company will provide greater career

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

opportunities for employees.  We look forward to bringing together our teams to realize the potential of this combination."

**Strategic Rationale – Powering the Markets of the Future**

- **Greater scale and business mix**: The transaction creates a combined business with increased scale and world-class products in core market segments.  The combined company will have balanced earnings across major industry segments and a resilient portfolio, providing additional financial flexibility to pursue value-creating opportunities.
- **Creates strong offerings in high-growth adjacencies**: The combined company will be differentiated in attractive high-growth adjacencies, including ESG, climate and energy transition, private assets and SME, counterparty risk management, supply chain and trade, and alternative data, which together represent $20 billion of total addressable market, growing at least 10% annually. As part of its ongoing commitment to remain on the cutting edge of technology and innovation, the combined company will continue to deploy well above $1 billion annually on technology.
- **Increased customer value proposition**: The transaction brings together both companies' customer-first cultures and broadens their combined reach across client segments, workflows and use cases. The pro forma organization will serve diverse customer segments across financial services, corporates and governments with differentiated data and intelligence, including the potential to link and create novel insights from new data set combinations. S&P Global and IHS Markit's complementary product portfolios are expected to enable the combined company to serve new and expanded customer use cases in existing and new geographies.
- **Best-in-Class talent**: The combined company will benefit from two best-in-class workforces with deep expertise and strong, complementary cultures focused on serving the global needs of customers. As a single organization, the collective workforce will benefit from expanded opportunities for career development and growth.

**Financial Benefits – Strong Financial Profile and Outlook**

- **Enhanced growth profile**: The pro forma company will have 76% recurring revenue and expects to realize 6.5-8.0% annual organic revenue growth in 2022 and 2023, balanced across major industry segments.
- **Increased profitability**: The combined company will target 200 basis points of annual EBITA margin expansion.
- **Attractive synergy opportunities and earnings accretion**: The transaction is expected to be accretive to earnings by the end of the second full year post-closing.   The combined company expects to deliver annual run-rate cost synergies of approximately $480 million, with approximately $390 million of those expected by the end of the second year post-closing, and $350 million in run-rate revenue synergies for an expected total run-rate EBITA impact of approximately $680 million by the end of the fifth full year after closing.

- 8 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- **Maintains strong balance sheet to pursue further growth**: The combined company is expected to maintain a strong balance sheet and credit profile, with pro forma annual revenue of more than $11.6 billion.  S&P Global intends to maintain a prudent and flexible capital structure and will target leverage of 2.0-2.5x EBITA, on an agency-adjusted basis.
- **Enhanced free cash flow generation to support attractive capital return**: The combined company expects to generate annual free cash flow exceeding $5 billion by 2023, with a targeted dividend payout ratio of 20-30% of adjusted diluted EPS and a targeted total capital return of at least 85% of free cash flow between dividends and share repurchases.  Both companies expect to maintain their current dividend policies until the close of the transaction.

**Management and Board**

Following closing, the Company will be headquartered in New York with a substantial presence in key global markets across North America, Latin America, EMEA and Asia Pacific.

The combined company is committed to retaining a strong, highly qualified and diverse Board that has the appropriate skills, knowledge and experience to oversee the company and its long-term strategic growth and performance.   The combined company's Board of Directors will include the current S&P Global Board of Directors and four directors from the IHS Markit Board.  Richard Thornburgh, current Chairman of S&P Global, will serve as Chairman of the combined company.

The leadership team will comprise senior leaders from both organizations.  Ewout Steenbergen, Executive Vice President and Chief Financial Officer of S&P Global, will serve as Chief Financial Officer of the combined company.

The transition and integration of the combined company will be led by executives from both S&P Global and IHS Markit.  The approach to integration planning will draw from the best practices of both companies to ensure continuity for customers, employees and other stakeholders.

**Timing and Approvals**

The transaction is expected to close in the second half of 2021, subject to, among other things, the expiration or termination of the applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, other antitrust and regulatory approvals, and other customary closing conditions.   The transaction requires the approval of shareholders of both S&P Global and IHS Markit and is not subject to any financing conditions.

**Insiders' Interests in the Proposed Transaction**

30.     S&P Global insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted

- 9 -

because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of S&P Global.

31.     Notably, certain Company insiders have secured positions for themselves with the combined company.  For example, each of the defendant directors will serve on the board of the combined company following completion of the Proposed Transaction.

32.     Further, S&P Global insiders stand to reap substantial financial benefits for securing the deal with IHS Markit.  For example, S&P Global has agreed to grant one-time equity incentive awards, in the form of S&P Global restricted share unit awards (the "Milestone Incentive Awards"), to certain Company insiders to incentivize his or her continued employment through the completion of the merger and the post-merger integration period.  The aggregate value of the milestone incentive awards for the four S&P Global executive officers who are receiving them and who are not named executive officers is $10,500,000.  The following table sets forth the value of the milestone incentive awards that named executive officers stand to receive:

| Named Executive Officer | Cash ($) | Equity($)(1) | Benefits($) | Total ($) |
|---|---|---|---|---|
| Douglas L. Peterson | — | 10,000,000 | — | 10,000,000 |
| Ewout L. Steenbergen | — | 5,000,000 | — | 5,000,000 |
| John L. Berisford | — | 5,000,000 | — | 5,000,000 |
| Martina Cheung | — | 6,500,000 | — | 6,500,000 |

33.     Moreover, S&P Global has granted certain S&P Global executive officers who are not named executive officers a one-time cash retention incentive award (the "retention awards") to incentivize his or her continued employment through the completion of the merger and the post-merger integration period.  The aggregate value of the retention awards for the five S&P Global executive officers who are receiving them and who are not named executive officers is $6,000,000.

34.     Additionally, S&P Global has entered into severance arrangements with three executive officers who are not named executive officers that provide for cash severance upon a qualifying termination of employment in connection with the merger.  Upon a qualifying termination

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of employment, the estimated aggregate cash severance payable under the foregoing arrangements is $11,780,000.

***The 424B3 Contains Material Misstatements or Omissions***

35.     The defendants filed a materially incomplete and misleading 424B3 with the SEC and disseminated it to S&P Global's stockholders.   The 424B3 misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Share Issuance.

36.     Specifically, as set forth below, the 424B3 fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) IHS Markit's and S&P Global's financial projections and the data and inputs underlying the valuation analyses performed by Goldman; and (ii) Goldman's potential conflicts of interest.

***Material Omissions Concerning IHS Markit's and S&P Global's Financial Projections and Goldman's Financial Analyses***

37.     The 424B3 omits material information regarding IHS Markit's and S&P Global's financial projections.

38.     For example, for each of the S&P Global Projections for S&P Global, S&P Global Projections for IHS Markit, S&P Global Projections for the Combined Company, IHS Markit Projections for IHS Markit and IHS Markit Projections for S&P Global, the 424B3 fails to disclose the line items underlying unlevered free cash flows.

39.     Additionally, with respect to the S&P Global Projections for S&P Global and IHS Markit Projections for S&P Global the 424B3 fails to disclose Adjusted EBITDA.

40.     Moreover, with respect to the S&P Global Projections for IHS Markit the 424B3 fails to disclose: (i) adjusted net income; and (ii) adjusted diluted EPS.

41.     Furthermore, with respect to the S&P Global Projections for the combined company the 424B3 fails to disclose: (i) adjusted EBITDA; and (ii) adjusted net income attributable to common shareholders.

42.     The 424B3 also describes Goldman's fairness opinion and the various valuation analyses performed in support of its opinion.  However, the description of Goldman's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, S&P Global's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Goldman's fairness opinion in determining whether to vote in favor of the Share Issuance.

43.     With respect to Goldman's *Illustrative Discounted Cash Flow Analysis* of S&P Global, *Illustrative Discounted Cash Flow Analysis* of IHS Markit and *Illustrative Pro Forma Discounted Cash Flow Analysis,* the 424B3 fails to disclose: (i) quantification of the terminal year free cash flow used in each of the analyses; (ii) how the terminal year free cash flows were calculated; (iii) Goldman's basis for using free cash flow as opposed to unlevered free cash flow to derive the terminal values; and (iv) quantification of the inputs and assumptions underlying the discount rates ranging from 6.0% to 6.5%,  used in each of the analyses; and (vi) the net debt figures and the number of fully diluted outstanding shares used in each of the analyses.

44.     With respect to Goldman's *Illustrative Present Value of Total Future Shareholder Value Analysis* of S&P Global, *Illustrative Present Value of Total Future Shareholder Value Analysis* of IHS Markit and *Illustrative Pro Forma Present Value of Total Future Shareholder Value Analysis,* the 424B3 fails to disclose quantification of the adjustments for interim dividends and share repurchases utilized in the analyses.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

45.     The omission of this information renders the statements in the "Certain Unaudited Prospective Financial Information" and "Opinion of S&P Global's Financial Advisor" sections of the 424B3 false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Goldman's Potential Conflicts of Interest***

46.     The 424B3 fails to disclose material information concerning the potential conflicts of interest faced by Goldman.

47.     The 424B3 sets forth:

> The engagement letter between S&P Global and Goldman Sachs provides for a transaction fee of $45 million plus an additional fee of up to $7.5 million which may be payable at the sole discretion of S&P Global, all of which is contingent upon consummation of the merger.

424B3 at 85.  The engagement letter between S&P Global and Goldman provides for a transaction fee of $45 million plus an additional fee of up to $7.5 million which may be payable at the sole discretion of S&P Global, all of which is contingent upon consummation of the merger.  The 424B3, however, fails to disclose the parameters and criteria Goldman needs to satisfy to receive the discretionary fee and whether the Company anticipates paying Goldman the additional fee.

48.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

49.     The omission of this material information renders the statements in the "Opinion of S&P Global's Financial Advisor" section of the 424B3 false and/or materially misleading in contravention of the Exchange Act.

50.     The Individual Defendants were aware of their duty to disclose the above-referenced omitted information and acted negligently (if not deliberately) in failing to include this information in the 424B3.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Share Issuance, Plaintiff and the other stockholders of S&P Global will be unable to make an

informed voting decision in connection with the Share Issuance and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

51.    Plaintiff repeats all previous allegations as if set forth in full.

52.    During the relevant period, defendants disseminated the false and misleading 424B3 specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

53.    By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the 424B3.  The 424B3 was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the Company's and IHS Markit's financial projections, the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Goldman, and Goldman's potential conflicts of interest.  The defendants were at least negligent in filing the 424B3 with these materially false and misleading statements.

54.    The omissions and false and misleading statements in the 424B3 are material in that a reasonable stockholder would consider them important in deciding how to vote on the Share Issuance.

55.    By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

56.    Because of the false and misleading statements in the 424B3, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Claims Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

57.     Plaintiff repeats all previous allegations as if set forth in full.

58.     The Individual Defendants acted as controlling persons of S&P Global within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of S&P Global, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the 424B3 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

59.     Each of the Individual Defendants was provided with or had unlimited access to copies of the 424B3 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The 424B3 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Share Issuance.  They were, thus, directly involved in the making of the 424B3.

61.     In addition, as the 424B3 sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Share Issuance.  The 424B3 purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

62.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

63.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, S&P Global's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in its favor on behalf of S&P Global, and against defendants, as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to S&P Global stockholders;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   Dated: February 1, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WEISSLAW LLP**
Joel E. Elkins

By: */s/ Joel E. Elkins*

Joel E. Elkins
9100 Wilshire Blvd., #725 E.
Beverly Hills, CA 90210
Telephone:  310/208-2800
Facsimile:  310/209-2348
        -and-
Richard A. Acocelli
1500 Broadway, 16th Floor
New York, NY  10036
Telephone: 212/682-3025
Facsimile:  212/682-3010

*Attorneys for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS